274

## DARPHIN et al. v. CONTINENTAL OIL CO. et al.

## FUSELLIER et al. v. SAME.

### Nos. 746, 747.

District Court, W. D. Louisiana, Lake Charles Division.

Oct. 27, 1937.

Pugh & Buatt, of Crowley, La., Harold Moses, of New Orleans, La., and J. J. Davidson, Jr., of Lafayette, La., for complainants.

McCoy, King & Jones, C. R. Liskow, and Austin W. Lewis, all of Lake Charles, La., for respondents.

DAWKINS, District Judge.

The issues in these two cases are the same. According to the allegations of the petitions, the Federal Land Bank of New Orleans (hereafter called the Land Bank) was the owner of certain lands, and on August 8, 1934, executed a single mineral lease covering all of the tracts involved in both cases to the Tepetate Oil Company which in turn assigned it to the defendant Continental Oil Company (hereafter called Continental). Thereafter the Land Bank sold to various individuals the several tracts and reserved to itself a one-fourth interest in the minerals or royalties to be paid the lessor. The Continental paid the rentals stipulated on or before August 8, 1935, re-

newing the lease for another year, and, while it thus remained in force, drilled a well upon one of the tracts, sold to L. L. Welsh, which produced oil in paying quantities. No further rentals were paid, and plaintiffs in these suits seek to have the lease forfeited or canceled, in so far as it affects their respective tracts for nondevelopment, and, in the alternative, claim a pro rata share of the royalties from the Welsh tract, on the basis of the entire acreage covered by the original lease of the Land Bank to the Tepetate Oil Company. They allege that the Welsh tract "is not adjoining or contiguous to the properties belonging to petitioners * * *"; and, that development having been refused, they demanded cancellation, which likewise has been declined. The prayer is in accordance with the allegations of the petition, first for the cancellation and, alternatively, for a portion of the royalties from the Welsh tract.

Defendants have moved to dismiss on the ground that the petitions disclose no cause or right of action.

The lease, copy of which is annexed and made part of the petition, is in the usual form, and, for a cash consideration of $2,-782.95, and the obligations assumed with respect to drilling or payment of rentals, grants to the lessee the exclusive right to explore the entire tract for oil, gas, and other minerals for a period for three years from its date, August 8, 1934, "and as long thereafter as oil, gas, sulphur or other minerals, or any of them, are produced in paying quantities from the said land by the said lessee." It is further provided that the lease shall "automatically and instantly terminate * * * as to both parties, unless lessee pays unto the lessor on or before August 8, 1935, $5.00 per acre for the land described herein, and in addition to the payment of such sum, commences drilling operations within a radius of two miles of the property leased hereunder, the payment of which sum and the fulfillment of the additional two-mile drilling obligation will operate as a rental and cover the deferment of drilling operations until August 8, 1936, at which time if drilling operations are not prosecuted with due diligence on the immediate lands leased hereunder, this lease will automatically terminate as to both parties unless the lessee pays unto the lessor on or before August 8, 1936, the sum of $5.00 per acre, the payment of which sum will operate as a rental and will cover the defer-

ment of drilling operations until the 8th day of August, 1937, at which time, viz., August 8, 1937, if such drilling operations are not being prosecuted with due diligence on the immediate lands leased hereunder, this lease shall automatically terminate as to both parties unless lessee pays unto the lessor on or before August 8, 1937, the sum of $5.00 per acre, the payment of which sum will operate as a rental and will cover the deferment of drilling operations until August 8, 1938, at which time this lease will terminate through expiration."

The said lease also provides: "That should the Lessee hereunder default in any of the terms or conditions of this lease, or if this lease shall terminate for any reason whatsoever the said Lessee expressly agrees to execute unto the Lessor written release of all rights, interest and privileges which the Lessee may have acquired under this lease provided that in the event of any such default the Lessee may still retain and hold under the terms of this lease five acres around each producing well as long as oil, gas or other minerals are produced from said five acres upon the payment unto the Lessor of the royalty hereinabove stipulated, the said tract to be designated by Lessee in as near a square form as practical."

"V. If, at the expiration of the primary term, oil, gas, sulphur or other minerals have not been found on said land but Lessee is then engaged in drilling operations thereon as defined above, this lease shall remain in force so long as such drilling operations are prosecuted with due diligence *unless such drilling operations result in the finding of oil, gas, sulphur or other minerals on or before said date, in which event this lease shall remain in force so long thereafter as oil, gas, sulphur and/or other minerals are produced and marketed from said land.*" (Italics by the writer of this opinion.)

"VIII. It is agreed that if at any time or times hereafter oil is being produced and sold off the leased premises and the market value of such oil at the well shall be less than one and no/100 ($1.00) dollars per barrel, Lessee may discontinue the production and sale of said oil, but in such case Lessee shall pay Lessor during such discontinuance at the rate of five hundred and no/100 ($500.00) dollars per year, payable monthly as royalty, and so long as such lieu royalty is paid, said well or wells shall be held wells producing oil in paying quantities."

"X. If the estate of either party hereto is assigned and the privilege of assigning in whole or in part is hereby expressly allowed, the covenants, hereof shall extend to their successors or assigns, but no change in ownership of the land or assignment of rents or royalties shall be binding on the Lessee until after the Lessee has been furnished with a written transfer of assignment or a true copy thereof, it being fully understood and agreed that if the estate of either party is assigned in whole or in part, such assignment will not in any manner operate to alter, relieve or reduce the obligations of either party hereto."

It is the position of the defendants that, the Continental, as assignee, having discovered oil in one of the tracts, that of Welsh, and continued production therefrom, the lease, under the provisions above quoted, ripened into a binding contract and preserved all of the rights of the lessee on all of the property covered by it, without the necessity of paying rentals, and that the lessor, having seen fit to divide the property or royalty interest between itself and other persons, cannot be heard to complain of the failure to develop any of the other portions so divided, nor can they claim any interest in the royalties from the part conveyed to Welsh.

On the other hand, counsel for the plaintiffs state the proposition for determination and their contention as follows:

"The original demand presents the question for determination as to whether, under the special terms of the lease in question, the drilling on tract No. 4, which is noncontiguous to the other property, is sufficient to prevent the cancellation of the lease as regards tracts 1, 2 and 3, also covered by the same lease, when the lessee has failed to pay the rentals or to begin drilling operations on the said three tracts.

"The defendants apparently base their entire contention on the ground that the mineral lease is indivisible, and that, therefore, the lease contract cannot be canceled as regards tracts 1, 2, and 3, if the company has carried out its obligations with respect to tract No. 4 and the lease remains in effect as to that tract. The defendants lose sight of the particular provisions of the lease which is presently before the Court. The provisions of the lease, together with

the settled jurisprudence of the State of Louisiana, clearly makes the lease contract divisible as regards the noncontiguous tracts in question."

Counsel for plaintiffs also in brief quote and rely on a part of clause X of the lease above quoted, reading: "If the estate of either party hereto is assigned and the privilege of assigning in whole or in part is expressly allowed, the covenants hereof shall extend to their successors or assigns, * * *" but omit from their quotation that portion of said paragraph providing: "* * * It being fully understood and agreed that if the estate of either party is assigned in whole or in part, such assignment will not in any manner operate to alter, relieve or reduce the obligations of either party hereto."

The principal argument then made is that, the tracts owned by the plaintiffs not being contiguous or adjoining that of Welsh, upon which production was had, it was necessary, in order to preserve the lease as to their tracts, for the defendant to drill upon each and every one of them, or to pay rentals.

Defendant has, I fear, confused the law of prescription with respect to the reservation or purchase of a servitude upon lands for the removal of minerals, as established by the state jurisprudence, with the contractual rights of the parties to such a lease. As to a servitude, which is the extent of the interest which can be lawfully acquired under such a reservation or purchase of minerals in this state, it is necessary, within the prescriptive period of ten years provided by the Civil Code, art. 765, to exercise the same by going upon and drilling a part of every noncontiguous tract, since it is the only way in which a servitude can be preserved or continued, but under the express terms of the lease in the present case (clause V above quoted), if the "operations result in the finding of oil, gas, etc. * * * on or before said date, in such event, this lease shall remain in force so long thereafter as oil, gas, etc. are produced and marketed from said land."

I do not believe that the provisions of the lease in this case are materially different, in so far as the issue to be decided is concerned, from those interpreted by the courts of the state, in which relief of the character here sought has been denied. See Nabors Oil & Gas Co. v. McCormick, 145 La. 88, 81 So. 766; W. A. Nabors v. Producers' Oil Co., 140 La. 985, 74 So. 527, L.R.A. 1917D, 1115. In the first of these cases, just as here, a single lease covered widely separated tracts, and thereafter portions of the lands were transferred to various persons, upon which development was had as to some and not as to others. The action was likewise for annulment as to only those tracts not developed, with the additional charge that the original lease was void because potestative or unilateral in its obligations. It was found that, regardless of the binding effect at its inception, the lessee had expended large sums of money in development and had made it a commutative contract, and in the syllabus, which was by the court, it was said:

"Where an action is brought to annul, in part, and leave undisturbed, in part, what purports to be an oil and gas lease affecting 7,000 acres of land, referred to as a single unit, though composed of many tracts, it necessarily proceeds upon the theory of a subsisting contract, notwithstanding allegations to the effect that it was void ab initio; and, such contract being one and indivisible, plaintiff has no standing, while holding on to benefits received and being received, and whilst unable or unwilling to restore the status quo ante, to demand that it be annulled in those respects wherein he disapproves, or derives no profits from, its execution, and be maintained or left undisturbed in those respects wherein he has found and is still finding a profit. The rights and obligations of such a contract, considered as a whole, are so interdependent, and so related to the whole body of the land, that they cannot thus be divorced from each other, or from the land, without creating a new contract."

In the second case, the court went even further in applying the doctrine of the joint and inseverability of the obligations of the lease with respect to all of the lands covered thereby. In that case, the owners of separate and distinct tracts of land joined in a single lease with stipulations similar to those in the present case, and it was likewise held that compliance with the terms of the contract by drilling on any part of the lands covered thereby was a sufficient compliance to continue it in force without the necessity of paying rentals or drilling upon each separate tract. I quote the following from the syllabi of this case, which was likewise by the court: "A mining lease whereby several lessors or grantors dispose of the mineral rights on several tracts of land, for a

gross price, without stating the amount paid to each grantor and without stating or designating the area of land belonging to each grantor, creates a joint obligation on the part of the lessors or grantors, because it is impossible to affirm that the lessee would have paid a proportionate consideration for the lease or mineral rights on only a portion of the land. In such a contract, a stipulation that operations for the drilling of a well for oil or gas shall be commenced by the lessee within one year, cannot be construed to mean that operations for the drilling of a well shall be commenced on each tract of land belonging to the different lessors or grantors."

It is true that the major purpose of the parties in making the original lease was to have the property explored for its minerals, and, if discovered, to be reasonably developed to the end that the lessor or any subsequent owner of its rights might profit therefrom. However, in so far as the validity and continued existence of the lease are concerned, I am of the opinion, in view of the above decisions, as well as my own construction as to the meaning of the contract, that the petitions in these cases do not state a cause of action. In an appropriate proceeding, if it can be shown that insufficient development has been had or that the defendant Continental has not or is not protecting the property from drainage, then the petitioners might be entitled to some form of relief; but, for the purpose of the present case, I think the exception should be sustained.

Proper decree should be presented.